Filed 1/17/24  P. v. Avila CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE GUZMAN AVILA,<br><br>    Defendant and Appellant. | 2d Crim. No. B321824<br>(Super. Ct. No. 2017012237)<br>(Ventura County) |

Jose Guzman Avila appeals his conviction, by jury, of continuous sexual abuse of a child under 14 years of age (Pen. Code, § 288.5, subd. (a)),[1] and two counts of lewd acts on a child. (§ 288, subd. (c)(1).)  The jury further found true the aggravating factors that the victim was vulnerable and that appellant took advantage of a position of trust.  (Cal. Rules of Court, rule 4.421(a)(3), (a)(11).)  He was sentenced to state prison for 19 years 8 months.  He now contends the trial court erred when it

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

instructed the jury in terms of CALCRIM Nos. 357 and 362 regarding adoptive admissions and consciousness of guilt and that his counsel rendered ineffective assistance at trial because counsel failed to object to either instruction.  Appellant further alleges the trial court erred when it denied his motion for new trial based on jury misconduct.  Finally, appellant contends the trial court erred when it failed to delineate the specific fines and fees imposed at sentencing and when it prepared an abstract of judgment that differs from the trial court's oral pronouncements at the sentencing hearing.  We will order the trial court to prepare a corrected abstract of judgment and, in all other respects, affirm.

*Facts*

V was about 9 years old when her parents divorced. About two years later, V's mother, A, started dating appellant. Appellant and A got married in 2014, when V was 12 or 13 years old.  From the time V was about 11 years old until she was 15, appellant sexually abused her about once a week.  He began by fondling her buttocks.  Over the next four years, appellant touched V's breasts and vagina, had anal and vaginal sex with her, orally copulated her and forced her to orally copulate him.

After V turned 12, she told her mother that appellant was touching her.  A told V, "to go talk to my aunts because she didn't want to deal with it."  V's Aunt Gabby told V, "that my mom was finally happy and that I just wanted to ruin their marriage."  V stopped telling her mom that appellant was abusing her because her mom didn't listen.  V felt like she didn't matter.

Just before Thanksgiving in 2016, when V was 15 years old, A "caught" appellant on top of V while they were on the

living room couch.  Appellant had inserted his penis into V's vagina.  When A entered the room, appellant got up and walked into the kitchen.  A followed him; as she passed by V, A slapped V on the leg and called her a "slut."  A also claimed V never told her about appellant's abuse.  Appellant left the house that night and started staying with his father.  Within a few weeks, V had moved in with her biological father.

V tried again to tell her mother that appellant had been abusing her, but A would not listen.  She claimed V never said anything to her about the abuse.  After that, V started talking to other family members, "[b]ecause my mom couldn't deal with it."  V talked to her Aunt Andrea, her grandmother, and her grandmother's sister, Aunt Patty.  V found it uncomfortable to discuss the abuse with her family members.  While speaking with them, V denied that appellant sexually penetrated her.

After appellant moved out of their house, A had several telephone conversations with him about V's accusations.  Appellant denied ever touching V inappropriately.  On one occasion, when A was with V, she made a pretext call to appellant.  During the call, A told appellant that V had just came home from the doctor and was pregnant.  Appellant responded, "Nothing happened.  If she's pregnant, it's not mine."  V told appellant, "don't lie to my mom.  You know what you did."  Appellant continued to deny touching and raping V.  Eventually, however, he said, "Fine.  I kissed her.  Is that what you want to hear?  I kissed her."  Appellant also said that kissing V was "the worst thing I have ever done in my life."  A described his voice as sounding "sarcastic," and "frustrated."  V told A that appellant

3

had never kissed her and was lying. Appellant hung up after V accused him of lying.

About three weeks after A caught appellant on the couch with V, A's mother and other family members told her that they would report the matter to police if A did not. A went to appellant's home to tell him that her relatives were going to call the police. Appellant called A's aunt Patty and had "a very unpleasant phone call with her."

Before she learned that he had been abusing V, Patty had a close friendship with appellant. She testified that appellant called her around Thanksgiving and was "hysterically crying." He asked her to forgive him "for ruining the family and ruining everybody's life." Appellant continued to deny having sexual relations with V but admitted that he had sexual thoughts about her.

Appellant called Patty again around December 12. Patty put the call on speakerphone, so her mother and sister Irma could hear the conversation. Appellant had just learned that Child Protective Services and the sheriff had been contacted about his abuse of V. He was angry at Patty for "ruining his family." Patty told appellant, "if he hasn't done anything, why did he keep apologizing to me? Again, he mentioned that he never had sexual activity with [V]. He had sexual thoughts and intent. [¶] My response to him was that anyone who has sexual thoughts, intent, and an erect penis has no business of ever being in contact with [V] or any children for that matter." Appellant's response was "very heated" but he did not deny that he had an erect penis when he was around V.

During one of her conversations with appellant, Patty again asked appellant why he kept apologizing to her. Appellant

4

"admitted he had sexual thoughts and that he was at the point of half penetration."

Patty's sister Irma testified that she overheard the December 12 phone conversation because Patty put appellant's call on speakerphone. According to Irma, Patty told appellant that A saw him with an erection while he was with V. Irma recalled that appellant said, "Just because I am attracted to her – this happens when I am around her. But he was vague in how he said that when he's around her, he has an erection." Appellant also denied that he ever "did anything." Irma recalled him saying, "Just because I'm around her and have an erection doesn't mean that I did anything."

Over the next several weeks, V gave three separate interviews to three different police officers. The first two officers were men; the third was a woman. V testified that she was uncomfortable discussing her abuse with the male officers, so she told them that appellant had groped her, but did not mention anal or vaginal penetration. In the interview with the female officer, V disclosed the anal and vaginal penetration.

*Contentions*

Appellant contends the trial court erred when it instructed the jury with the pattern jury instructions on adoptive admissions (CALCRIM No. 357) and false statements reflecting a consciousness of guilt (CALCRIM No. 362) because the evidence at trial did not support the instructions. He contends he received ineffective assistance of counsel at trial because counsel failed to object to either instruction. Appellant contends the trial court erred when it denied his motion for new trial based on jury misconduct. Finally, appellant contends the trial court erred because it failed to specify the amount of a fine imposed under

5

section 290.3 and when it prepared an abstract of judgment that does not accurately reflect other fines and fees imposed at sentencing.

*Discussion*

*Instructional Error*

<u>Adoptive Admission</u>. The trial court instructed the jury in terms of CALCRIM No. 357 that, "If you conclude that someone made a statement outside of court that tended to connect the defendant with the commission of the crime and the defendant did not deny it," and the jury finds that certain other facts are true, it could "conclude that the defendant admitted the statement was true."[2] Appellant contends the trial court erred because the evidence at trial did not support this instruction. We disagree.

""[B]efore a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. . . ." . . .'" (*People v. Alexander* (2010) 49 Cal.4th 846, 920-921

---

[2] The instruction provides: "If you conclude that someone made a statement outside of court that tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: 1. The statement was made to the defendant or made in his presence; 2. The defendant heard and understood the statement; 3. The defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true; AND 4. The defendant could have denied it but did not. If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose." (CALCRIM No. 357.)

6

(*Alexander*); see also *People v. Chism* (2014) 58 Cal.4th 1266, 1298 [error to instruct on adoptive admissions where "there was no properly admitted evidence of an adoptive admission"].) "'[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception[,]'" and we review its "'conclusions regarding foundational facts for substantial evidence. . . .'" (*Chism, supra,* at p. 1297, quoting *People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

Appellant contends there was no evidentiary basis for the instruction because appellant repeatedly denied abusing V. However, during the pretext call with A and V, appellant "sarcastically" said that he had kissed V. V accused him of lying and insisted they had never kissed. Rather than deny V's accusations, appellant ended the call. Similarly, during his conversation with Patty, appellant did not deny having an erection around V. These incidents supplied an evidentiary basis for the adoptive admission instruction because a reasonable trier of fact could infer from appellant's silence on both occasions that he was lying and V was telling the truth.

Because the trial court properly instructed the jury in terms of CALCRIM No. 357, the "failure" of defense counsel to object to the instruction did not constitute ineffective assistance. (*People v. Boyette* (2002) 29 Cal.4th 381, 437 (*Boyette*).)

<u>Consciousness of Guilt</u>. The trial court instructed the jury in terms of CALCRIM No. 362 regarding false statements and the consciousness of guilt.[3] Appellant contends the trial

---

[3] The instruction provides, "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and

7

court erred because his statements denying the sexual assaults against V were not false, but were instead the defense theory of the case. We are not persuaded.

The trial court may properly give an instruction on consciousness of guilt where there is "some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 102.) It is not necessary that the facts giving rise to the inference be conclusively established before the instruction may be given. (*Alexander, supra,* 49 Cal.4th at p. 921.) Where the inference is based on a defendant's false or conflicting pretrial statements, the falsity of those statements may be shown by the testimony of others, "even when the [defendant's] pretrial statement is not inconsistent with defendant's testimony at trial." (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1103.)

"What matters is the falsity of the defendant's statements and their relevance to the charges against him, not the means by which the are proven false. False statements which 'are apparently motivated by fear of detection, or which . . . suggest there is no honest explanation for the incriminating circumstances' may be used as evidence of the accused's guilt." (*People v. Mendoza* (1987) 192 Cal.App.3d 667, 673.)

Here, the evidence showed that appellant made conflicting statements to his wife A and to Patty regarding his conduct with V. After A saw appellant on the living room couch

you may consider it in determining his guilt. If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." (CALCRIM No. 362.)

8

with V, appellant denied any inappropriate contact with V. During subsequent telephone conversations, appellant changed his story, at first insisting he had done nothing wrong, then admitting he had kissed V and then abruptly ending a call when V accused him of lying. He followed a similar pattern in conversations with Patty, shifting from complete denial, to admitting "sexual thoughts and intent," to tacitly accepting the accusation that he had an erect penis around her, and then finally admitting that he had been "at the point of half penetration."

A jury could reasonably infer from appellant's changing stories that he made false or misleading statements to deflect the suspicions of his family members and convince them that V was lying. Accordingly, the trial court did not err in giving the consciousness of guilt instruction to the jury. (*People v. Howard* (2008) 42 Cal.4th 1000, 1025 [CALCRIM No. 362 properly given where "the jury could quite reasonably conclude that defendant made a series of false statements to deflect suspicion from himself"].) Because the instruction was supported by substantial evidence, appellant's trial counsel was not ineffective for failing to object to it. (*Boyette, supra*, 29 Cal.4th at p.437.)

*Jury Misconduct*

Appellant's motion for new trial argued that prospective jurors committed misconduct during voir dire by discussing the case among themselves. He also submitted declarations from two friends indicating they saw a witness make "constant eye contact" with the jury foreperson and overheard the foreperson comment on the case outside of the courtroom. Appellant now contends the trial court erred in denying the

9

motion without properly investigating these claims or holding an evidentiary hearing on them. There was no abuse of discretion.

At the end of the first day of voir dire, the first panel of prospective jurors left the courtroom while the second panel of prospective jurors was waiting in the hallway outside the courtroom. The trial court swore in the members of the second panel and instructed them to return the next morning. When trial re-convened, defense counsel informed the trial court that A stated she overheard prospective jurors commenting on the case in the hallway before they first entered the courtroom. A claimed to have heard prospective jurors say, "'Poor little girl,' and 'Oh, it happened three years ago.'"

The prosecutor noted that A's claim seemed "distinctly implausible" because, when A claimed to have heard the statement, the second panel of prospective jurors did not know any factual details about the case. In addition, the first and second panels had no opportunity to fraternize, because they were in the same space only momentarily.

The trial court reached the same conclusion. It declined to question the prospective jurors individually. Instead, the trial court decided to "just ask the jury if they – if anybody has heard anything about this case from other jurors or knows anything about the charges. If a hand goes up, then we'll go further from there. If no hands go up, then I don't know what to say." Defense counsel replied, "I would agree that's an appropriate procedure, your Honor." None of the prospective jurors indicated they heard or knew anything about the case.

Prior to sentencing, defense counsel filed a motion for new trial based on juror misconduct. The motion was supported by the declarations of A and two of appellant's personal friends.

A declared that, after lunch on the first day of voir dire, she overheard the juror who would later become the foreperson say, "'Do you guys know what this is about?'" On the second day of voir dire, A overheard a potential juror say, "'Did you hear this is a case about a stepdad who raped his stepdaughter?'" After that comment, one of the women "made a loud gasp, and said, 'That poor little girl!'" Two days later, A claimed to have overheard the forewoman say, "'I don't even know why he shows up, we are going to find him guilty.'"

Appellant's friend Raul Reyes declared that he noticed V's Aunt Patty sit in the audience and "make constant eye contact with the foreperson." He also stated that he overheard jurors discussing the case while waiting for the courtroom to open. Martin Guzman declared that he heard a juror say, referring to appellant, "'Why is he even here?'" Another juror put his finger to his mouth, gesturing for her to be quiet. Guzman also noticed Patty making eye contact with the forewoman and other members of the jury.

The trial court declined to hear live testimony in support of the motion because, after listening to A's trial testimony, it "found her to be noncredible, completely, as did the jury." The trial court stated, "I just don't find her credible. So listening to her testify would do nothing." It also declined to hear testimony from appellant's other witnesses because they failed to report the alleged misconduct when they first observed it. In addition, "the things that they're saying just factually couldn't be true." Concluding the allegations were "highly suspect" and lacked "any sort of credibility," the trial court denied the motion for new trial.

11

Appellant contends the trial court erred when it declined to conduct an evidentiary hearing on the allegations of juror misconduct. We are not persuaded.

"'We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 604.) Appellant has a right to trial by an impartial jury that will decide the case based solely on the evidence before it, without any improper influence. (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) "Jurors 'convers[ing] among themselves or with anyone else, . . . on any subject connected with the trial' is juror misconduct. [Citation.] Juror misconduct "'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted."' [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 332.)

The trial court did not abuse its discretion. First, appellant forfeited the claim that he was entitled to a more robust investigation of the misconduct allegations. When those claims were first raised in the trial court, defense counsel agreed with the trial court's decision to question the second jury panel collectively. Because defense counsel "fully acquiesced in the court's approach" and did not request further investigation at that time, any claim that the inquiry was inadequate has been forfeited. (*People v. Powell* (2018) 6 Cal.5th 136, 185.)

Even if the claims had not been forfeited, we would reject them because substantial evidence supports the trial court's factual finding that the claimed misconduct did not occur. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.) Substantial evidence supports the trial court's finding that A, Reyes and Guzman were not credible because they were obviously biased,

12

they delayed informing the trial court of the claimed misconduct until after the jurors were excused, and their allegations were inconsistent with facts known to the trial court.  For example, A claimed to have overheard conversation among prospective jurors before those jurors had been sent to the courtroom and before they had any means of knowing the subject matter of the case.  She claimed to have overheard other comments after the trial court admonished her to avoid any contact with jurors.  The trial court directly observed A's testimony at trial and, like the jury, found her wholly unbelievable.  In light of this evidence, the trial court acted well within its discretion when it declined to hold an evidentiary hearing and denied the motion for new trial.

*Assessments and Fines*

At appellant's sentencing hearing, the trial court found that appellant "has no ability to pay for the cost of the state restitution fund fee. . . .  So I am going to waive that fee."  It then ordered appellant to pay direct victim restitution to both V and her biological father and to the Victims Compensation Board.  The trial court further stated, "Pursuant to [section] 290.3 of the Penal Code, the defendant is ordered to pay a fine of $5,200, including penalty assessment."  It did not specify how it arrived at that figure or whether other fines and fees were struck based on appellant's inability to pay.  The abstract of judgment reflects the imposition of victim restitution, a fine of $5200 pursuant to Penal Code section 290.3, a $120 fine pursuant to Penal Code §1465.8 and a $90 fine pursuant to Government Code §70373.  The latter two fines were not mentioned by the trial court at sentencing.

Appellant contends the matter must be remanded to permit the trial court to specify which fines, fees and assessments

13

it intended to impose and which it intended to waive based on appellant's inability to pay. Respondent correctly concedes the matter must be remanded for this purpose.

The trial court is required to specify each fine and fee imposed both at sentencing and in the abstract of judgment. (*People v. High* (2004) 119 Cal.App.4th 1192, 1200.) "The abstract of judgment should detail the amounts of and statutory basis for the base fine and each of the penalty assessments imposed." (*People v. Johnson* (2015) 234 Cal.App.4th 1432, 1459.) Here, the trial court's statement is too general and the abstract of judgment appears to differ in some respects from it. We will remand the matter to permit the trial court to clarify which fines and fees it intended to impose, if any, and which it intended to waive based on appellant's inability to pay. The trial court shall then prepare and forward to the Department of Corrections and Rehabilitation a corrected abstract of judgment detailing the specific fines, fees and assessments, if any, imposed.

*Conclusion*

The matter is remanded for recalculation and clarification of fines, fees and assessments imposed. The clerk of the superior court shall prepare and forward to the Department of Corrections and Rehabilitation a corrected abstract of judgment reflecting the trial court's modifications and corrections. In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, Acting P. J.

We concur:

BALTODANO, J.       CODY, J.

14

Ryan J. Wright, Judge

Superior Court County of Ventura

_____

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, Marc A. Kohm, Deputy Attorney General, for Plaintiff and Respondent.